# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## WCA 20-391


ALMA MOORE

VERSUS

KELLIE'S SITTING SERVICES, INC.



**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 19-03259
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Elizabeth A. Pickett, and D. Kent Savoie, Judges.


**AFFIRMED.**

**Bradley J. Gadel**
**Bradley J. Gadel, APLC**
**728 Jackson Street**
**Alexandria, LA 71301**
**(318) 448-4406**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Kellie's Sitting Services, Inc.**

**Maria Anna Losavio**
**Losavio Law Office, LLC**
**1821 MacArthur Drive**
**Alexandria, LA 71315**
**(318) 767-9033**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Alma Moore**

**SAVOIE, Judge.**

In this workers' compensation case, Plaintiff, Alma Moore (Ms. Moore), appeals the workers' compensation judge's (WCJ's) dismissal of her claims for benefits for alleged injuries to her left shoulder, cervical spine, and lumbar spine, as well as the denial of her requests to seek additional medical treatment with a second orthopedist and a physical medicine and rehabilitation specialist. For the following reasons, we affirm.

## Factual and Procedural Background

On March 18, 2016, Ms. Moore was involved in an accident while working for Kellie's Sitting Services, Inc. ("Kellie's"). On that day, she and a co-worker were walking to a client's house, but due to weather and flooding, they took a different route along the railroad tracks. After Ms. Moore's co-worker believed he saw something in the water, he shouted, startling Ms. Moore, who then fell backwards down an embankment. It is undisputed that the March 18, 2016 accident occurred within the course and scope of Ms. Moore's employment with Kellie's and that Ms. Moore sustained an injury to her right shoulder in connection with the accident.

After the accident, Kellie's workers' compensation insurer paid benefits to, or on behalf of, Ms. Moore. However, in approximately November 2017, Kellie's workers' compensation insurer became insolvent, and Louisiana Insurance Guaranty Association (LIGA) began paying benefits to, or on behalf of, Ms. Moore.

Ms. Moore initially received treatment from Dr. Gordon Webb on the day of the accident. Dr. Webb's report from that date notes that Ms. Moore could not move her right shoulder, but that she otherwise reported no head impact, and no pain in her neck, back, or across her shoulders. His report also notes that X-rays from that

day showed no fracture or dislocation, and that Ms. Moore's right arm was placed in a sling. Dr. Webb's records also indicate that a referral to an orthopedist was appropriate.

On March 31, 2016, Ms. Moore submitted a form to Kellie's requesting Dr. Garrison with Mid-State Orthopedics & Sports Medicine (Mid-State) as her choice of orthopedist. However, according to Ms. Moore, he was unavailable to take her as a patient. Therefore, Ms. Moore saw Dr. William Crenshaw, who was also an orthopedist at Mid-State.

Ms. Moore started treating with Dr. Crenshaw in April 2016. According to Dr. Crenshaw's medical records, Ms. Moore was later diagnosed with a rotator cuff tear in her right shoulder, and she underwent surgery on May 23, 2016. She then began physical therapy at Elite Physical Therapy. On October 31, 2016, Ms. Moore underwent a right shoulder manipulation and injection under anesthesia. She thereafter resumed physical therapy and continued to follow up routinely with Dr. Crenshaw.

In January 2017, Ms. Moore began complaining of pain in her left shoulder, as reflected in her physical therapy records. The first report to Dr. Crenshaw regarding pain in her left shoulder was February 14, 2017. Dr. Crenshaw's report from that date states:

> Still complaining of weakness and pain of the right shoulder. Now complaining of left shoulder pain as well. Have written for her to continue with physical therapy 2 times a week for another 6 weeks. Have also ordered inflammatory labs including a CBC, ESR, CRP, anti-nuclear test and rheumatoid factor. I will see her back here in 6 weeks in AP and axillary lateral outlet of the left shoulder on follow up.

Ms. Moore saw Dr. Crenshaw again on March 28, 2017. Dr. Crenshaw's report from this date states:

2

> Still complaining of weakness and pain of the right shoulder. She needs to continue with therapy as she has had some improvement. Left shoulder rotator cuff tendinitis/tear. She now states that [t]he left shoulder is [m]ore symptomatic that [sic] her right and blames the new pain from over using left shoulder secondary to the right shoulder injury. Also states that it may have happened when she initially fell but the right shoulder was so painful she did not recognize the pain. WC is not covering the left shoulder and will talk to her WC about coverage. However with her continue [sic] symptoms she will likely need a MRI of the left shoulder to evaluate for a tear. Did discuss her going through IWC which she is established to receive ortho care. Did review her lab work and evaluation in the inflammatory markers and positive RF factor. We need to refer to Rheumatology and see if the service is available through IWC. Will have her f/u in 6w for the right shoulder.

Dr. Crenshaw's report from May 9, 2017, notes that Ms. Moore was attending physical therapy twice per week. The report further states, "She still complains of left shoulder pain which are not improved [sic] to treat and suggested that she follow up with primary care to make the proper referral."

According to Ms. Moore, on May 26, 2017, she sent a letter to her workers' compensation adjuster, Jessica O'Connell, stating she had attempted to reach her several times by phone but was unsuccessful. The letter further states that Ms. Moore had spoken to Dr. Crenshaw regarding "problems that I am experiencing with my left arm due to over compensation with my right arm" and requests "prompt attention in this matter." The letter also states Ms. Moore was experiencing pain "in my lower back extremities. . . and I have not spoken with Dr. Crenshaw regarding my back."

Ms. Moore saw Dr. Crenshaw again on June 20, 2017. His report from that date notes that Ms. Moore had no longer been going to physical therapy, but she had just received a letter from workers' compensation approving more physical therapy. The report further states, "She did recently get approved for more physical therapy. I'm uncomfortable and start that therapy [sic]. . . . Left shoulder we will hold off on

treating until she gets approval for Workmen's Compensation." The report further reflects Ms. Moore's complaint of tightness across her upper back and neck, and pain in her left shoulder.

Dr. Crenshaw's report from August 1, 2017, reflects Ms. Moore's indication that her pain was increasing and that she could not do physical therapy because it was too painful. The report further states:

> She continues to struggle with pain and stiffness in the shoulder. This is complicated by the fact that she subsequently is been found to have a positive rheumatoid factor which could contribute to her shoulder pain but obviously not related to her work-related injury directly. [S]he has complaints of bilateral shoulder pain. Have given her a prescription for Medrol Dosepak as well as Toradol . . . . This will help calm the inflammation down or she can get back into physical therapy which I think is the long-term he improved [sic]. She also needs an appointment with the rheumatologist to address possible autoimmune arthropathy. . . . I've ordered an EMG nerve conductions right upper extremity for numbness and weakness she is having [in] that hand.

Ms. Moore then had an EMG on August 30, 2017. A report from Dr. Michael Dole this date notes very mild carpal tunnel syndrome in the right upper extremity and further states, "[c]onsider MRI of cervical spine to further evaluate etiology of pain complaints."

Ms. Moore saw Dr. Crenshaw again on September 26, 2017. His report from that date notes the EMG/NCV study by Dr. Moore as showing very mild carpal tunnel syndrome and further states:

> [d]id recommend a carpal tunnel injection as if she had [sic] good results with that it may warrant a carpal tunnel release however she declined. She is given a carpal tunnel brace to use at night. She still has not followed up with rheumatology for the positive ANA profile. When [sic] her to continue with physical therapy. . . . She still complains of left shoulder pain which did not appear to treat the workman's comp [sic]. We will have her follow up with us in 8 weeks.

Dr. Crenshaw's next report is from Ms. Moore's appointment November 11, 2017. It notes Ms. Moore's complaints of pain and weakness in her right shoulder,

continued numbness, and tingling in her right hand.  The report further states, "Plan for functional capacity exam and impairment rating [for] the right shoulder.  We'll continue to follow for carpal tunnel syndrome.  As far as the left shoulder we will get her set up with Incarnate Word for evaluation of that as it is not workup [sic] related."

Dr. Crenshaw's report from January 23, 2018, states that he told Ms. Moore to call and make a claim with workers' compensation before he could see her for the left shoulder.  This report also notes that Ms. Moore had reached maximum medical improvement with respect to her right shoulder.  Dr. Crenshaw's report from May 4, 2018, also notes that Ms. Moore reached maximum medical improvement and needed to be referred for a Functional Capacity Exam (FCE).

Ms. Moore had an FCE on November 14, 2018.  The FCE report states that "Ms. Moore's target job has been identified as having a physical demand level, or PDL, of Sedentary."  The report further states:

> There were multiple inconsistencies noted throughout this evaluation.  The results presented in this report are not considered as Ms. Moore's maximal safe work capacity but simply a record of the weights and forces she successfully demonstrated during testing. . . . Because the results of testing indicate low effort, these results are not considered as representative of her true safe maximal work tolerances.

Ms. Moore saw Dr. Crenshaw again on January 29, 2019, at which time she was given an injection in her right shoulder to help with pain.  The report further notes Ms. Moore's complaints of sharp pain in her right shoulder, pain that radiates to her neck, weakness in her hands, and occasional numbness. The report also states, "the onset was sudden and without injury about a month ago."

Ms. Moore's last visit with Dr. Crenshaw's office was March 29, 2019, at which time she saw a nurse practitioner.  The nurse practitioner's report from this

date notes that Ms. Moore attended the appointment with a "caseworker" and that the injection from the previous visit did not help with her pain. The report states:

> The FCE was reviewed by myself and Dr. Crenshaw. We agree with her ability to return to sedentary type work. She is the Mayor of a town in this area and believe [sic] that job functions at sedentary duty would probably be very similar to mayorial responsibilities. [A]t this point she has reached maximum medical improvement and to create [sic] with her FCE and return to work. She will follow up with us on an as needed basis."

On April 2, 2019, Ms. Moore sent a letter to Bryan Johnson, an adjuster with LIGA, stating:

> I am writing this letter in regards to Dr. Crenshaw's decision on the status of my condition in which I strongly do not agree. Because of the decision that Dr. Crenshaw has made I am requesting a second opinion. Also I am attaching a copy of the letter that was written to my past adjuster Jessica O'Connell with several problems that I am having with my left arm in which was not addressed.in [sic] which I did not have any problems with until my injury with my right shoulder.

Mr. Johnson responded by letter to Ms. Moore on April 11, 2019. Therein, he noted that Ms. Moore had previously selected Dr. Garrison as her choice of orthopedic physician and that Dr. Garrison referred her to Dr. Crenshaw, an associate in his group. Therefore, according to Mr. Johnson and LIGA, Dr. Crenshaw was considered Ms. Moore's choice of physician, and a second medical opinion was not needed.

Mr. Johnson further stated in his April 11, 2019 letter that LIGA's review of Ms. Moore's medical records failed to confirm a problem with her left shoulder, noting that Dr. Crenshaw's exam on April 17, 2016, included an exam of the left shoulder and found no issues. The letter further states: "Dr. Crenshaw has never attempted to relate your left upper extremity issues to the referenced on the job accident. Therefore, our decision to deny your claims of injury to that body part remains the same."

Thereafter, Ms. Moore retained counsel. On April 25, 2019, Ms. Moore's counsel sent letters to Mr. Johnson requesting authorization for Ms. Moore to see Dr. Fenn as her choice of orthopedist and Dr. Leglue as her choice of physical medicine and rehabilitation specialist.

On May 17, 2019, Ms. Moore, through counsel, filed a Form 1008 Disputed Claim for Compensation with the workers' compensation court. Therein, she stated that she injured both shoulders and her lower back in connection with the work accident at issue. She further stated therein that the bona fide dispute in this matter was the employer's failure to authorize her requests to see Dr. Leglue and Dr. Fenn as her choices of physicians, as well as LIGA's failure to authorize medical treatment with these physicians. Thereafter, Kellie's, via LIGA who is providing Kellie's defense herein, submitted an Answer.

Trial was held October 22, 2019, on the issues of causation related to Ms. Moore's alleged injuries to her left shoulder, cervical spine, and lumbar spine, as well as Ms. Moore's requests for authorization to treat with Dr. Fenn and Dr. Leglue. Evidence consisted of Ms. Moore's testimony, medical records from Mid-State and Elite Physical Therapy, copies of Ms. Moore's correspondence to the workers' compensation adjusters, and Mr. Johnson's letter dated April 11, 2019. No medical or expert testimony was elicited at trial. Following trial, the WCJ took the matter under advisement.

On January 20, 2020, the WCJ issued detailed oral reasons for ruling, finding that Ms. Moore failed to prove by preponderance of the evidence that the March 18, 2016 accident caused injury to her left shoulder, cervical spine, and/or lumbar spine. The WCJ rendered judgment February 3, 2020, denying Ms. Moore's claims for

medical treatment associated with those areas, and further denying Ms. Moore's

requests to seek treatment with Dr. Leglue and Dr. Fenn.

Ms. Moore appeals. On appeal, she states the following as assignments of

error:

1. The trial court erred in not finding [P]laintiff had the right to her choice of orthopedist or that she had shown "good cause" to change orthopedists.

2. The trial court erred in not finding [P]laintiff was entitled to treatment with her choice of physical medicine and rehabilitation specialist.

3. The trial court erred in not finding [P]laintiff suffered injury to her left shoulder as a result of her work accident.

4. The trial court erred in not finding [P]laintiff suffered an injury to her cervical spine as a result of her work accident.

5. The trial court erred in not finding [P]laintiff suffered an injury to her lumbar spine as a result of her work accident.

## ANALYSIS

*Standard of Review*

As stated by the Louisiana Supreme Court in *Banks v. Industrial Roofing &*

*Sheet Metal Works, Inc.*, 96-2840, pp. 7-8 (La. 7/1/97), 696 So.2d 551, 556 (internal

citations omitted),

> Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Thus, "if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."

*Causation*

8

We first consider Ms. Moore's arguments on appeal that the trial court erred in finding that her alleged injuries to her left shoulder, cervical spine, and lumbar spine were not causally related to the accident on March 18, 2016. Ms. Moore argues that because she injured her right shoulder, she was left dependent on her left shoulder, which resulted in progressive deterioration of her left shoulder. She further argues that she injured her cervical and lumbar spines in connection with the March 18, 2016 accident.

The Louisiana Supreme Court addressed the issue of causation in *Buxton v. Iowa Police Department*, 09-520, pp. 11-14 (La. 10/20/09), 23 So.3d 275, 283-84 stating:

> An employee is entitled to compensation benefits if he or she suffers a personal injury by an accident arising out of and in the course of employment. LSA–R.S. 23:1031. This court has stated that under this statute a successful claimant's proof must show personal injury which is the result of an accident, which accident arises out of and in the course of employment. *Guillory v. United States Fidelity & Guaranty Insurance Company*, 420 So.2d 119, 122 (La.1982). The chain of causation required by the statutory scheme as adopted by the legislature in LSA–R.S. 23:1031 is that the employment causes the accident, the accident causes injury, and the injury causes disability. *Id.* The employee has the burden of proving, by a preponderance of the evidence, that the resulting disability is related to an on-the-job injury. . . . In *Prim v. City of Shreveport*, 297 So.2d 421, 422 (La.1974), this court stated:
>
>> Although procedural rules are construed liberally in favor of workmen's compensation claimants, the burden of proof, by a preponderance of the evidence, is not relaxed. Thus, the testimony as a whole must show that more probably than not an employment accident occurred and that it had a causal relation to the disability. If the testimony leaves the probabilities equally balanced, the plaintiff has failed to carry the burden of persuasion. Likewise, the plaintiff's case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture.
>>
>> . . . .

Under certain circumstances an aggravation of an injury initially sustained at work is regarded as compensable, obligating the employer to continue paying compensation benefits, even though the aggravation develops away from the premises and when the claimant is no longer employed by the employer. *Stewart v. Hospitals Affiliates International, Inc. of Baton Rouge*, 404 So.2d 944, 945 (La.1981) (A fall at home was causally connected to an at-work injury that weakened claimant's leg.) The aggravation is regarded as a development of the initial accident even though the aggravation develops away from the employer's premises after employment has terminated. *Id.* The Louisiana jurisprudence is consistent with "[m]ost jurisdictions" wherein the general rule is that "natural consequences that flow from the primary injury are compensable *absent an independent intervening cause.*" (Emphasis supplied.) Karenina M. Darmer, *Worker's Compensation for Off–Site Aggravation of Employment–Related Injuries–Blackwell v. Bostitch*, 591 A.2d 384 (R.I.1991), 26 Suffolk U.L.Rev. 529, 532–533 n. 18, citing *Hanover Insurance Company v. Allstate Insurance Company*, 554 So.2d 1261, 1264-1265 (La.App. 1 Cir.1989) (Parties stipulated that the off-the-job automobile accident occurred before claimant had fully recovered from surgery to his knee necessitated by a work injury; the surgeon testified the knee was still highly susceptible to injury.) . . . .

The key question is the relationship between the second injury and the initial, work-related injury. The courts have held that an accident occurring away from work is compensable, where the work-related injury has not healed at the time of the accident, and as such, rendered the employee susceptible to further aggravating injuries. *See Hughes v. General Motors Guide Lamp Division*, 469 So.2d 369, 376 La.App. 2 Cir.1985)[.]

At trial, Ms. Moore was the only witness to testify regarding the nature and cause of her alleged injuries. Otherwise, medical evidence consisted only of medical records from Mid-State and Elite Physical Therapy. No expert medical testimony or opinions were submitted into evidence.

Ms. Moore admitted at trial that she did not initially have any problems with her left shoulder and that it was not injured during the March 18, 2016 accident at issue. Rather, according to Ms. Moore, the problems she had with her left shoulder happened gradually over time, after the March 18, 2016 accident, as a result of her not being able to use her right shoulder and arm.

Ms. Moore began complaining of aching pain in her left shoulder to her physical therapist in January 2017, and then first reported her pain to Dr. Crenshaw in February 2017; however, according to Ms. Moore, Dr. Crenshaw never treated her left shoulder, as treatment had not been authorized by workers' compensation. When asked when she first noticed the pain in her left shoulder, Ms. Moore testified:

> It started slow and then when I started going to therapy . . . , I was trying to do the pulleys and I noticed I couldn't - - I couldn't pull, because I couldn't lift the left shoulder up. . . . It felt like the tear that I had on my right shoulder.

With respect to the pulleys, Ms. Moore explained at trial that after she resumed physical therapy following the closed manipulation of her right shoulder, weights and pulleys were added to her therapy. She stated:

> During my therapy, I was asked to do the pulleys, because that's what we start on when we first come in the door, the pulleys. . . . You have to use both arms to do the pulleys, because you have to pull – pull up and down on both. And that's what I noticed that the tension with my left shoulder - - it was like excruciating pain.

Ms. Moore also testified at trial that neither Dr. Crenshaw, nor any other doctor, had ever told her that her left shoulder complaints were related to the work accident. Rather, she testified that she just believes that they are related because she had to overuse her left arm. She explained that after her initial right shoulder surgery in May 2016, she could "not really" use her right arm, but was able to perform some functions with her left that she would normally perform with her right. She also stated that after surgery, she could not do anything for herself and had to rely on others to help her get up and down, bathe, dress, and comb her hair. She also explained that after her right shoulder became frozen around October of 2016, she could not do anything with it and could "hardly" lift it off of her lap; however, the

closed manipulation procedure increased her range of motion in her right shoulder. Ms. Moore's testimony explaining the alleged overuse of her left arm was as follows:

> Well, the reason I had to use my left arm more because my right arm felt like it just had no strength in it. I couldn't even hardly write my name. . . . I would try to pull my pants up or my underwear or attempt to try to put on a shirt, and I couldn't. I really just had to have somebody there with me to dress me.

Ms. Moore also testified at trial that "at some point" she noticed pain in her lower back, stating

> [i]t was like -- the lower part of my back, it was hurting, especially when I would try to get up. It gave me some resistance. . . . if I'm sitting down and I tried to get up, I couldn't get up. I had to get my husband or -- or one of my -- my kids to help me get up.

When asked how she believed her problems with her lower back were related to the work accident, she stated, "I feel like it's related because both my arms -- both my arms are hurt, and I'm trying to use my back to push myself up, and it's strained." Ms. Moore confirmed, however, that no doctor had ever told her that her pain in her lower back was related to the work accident.

With respect to Ms. Moore's alleged injuries to her neck, she testified generally that beginning in November 2016, following the closed manipulation procedure, she was having problems with her neck all the way to her right arm and left arm. She also testified, that, as of the date of trial, she was:

> Not doing so well. I have to -- I wrestle all night long because I have to have about six pillows or more to try to get some comfort because I can't sleep. I can't lay on my back. I can't lay on my side or anything. So I try to sit up, like at an incline, and then when I do that my neck hurts.

At trial, Ms. Moore admitted that Dr. Crenshaw had mentioned to her that a rheumatologist may be able to evaluate and explain the pain she was having, but that, as of the date of trial, she had not sought treatment with a rheumatologist. When

asked why she did not seek treatment elsewhere related to her left shoulder, neck, and/or back, or why she did not otherwise mention the problems she was having with those areas during medical appointments with other providers, she stated, "Because I felt like my injury from my right shoulder is the reason for my - - my left shoulder hurting, so I - - I never brought that into - - into play because I thought it was a workman's comp."

In its oral reasons for ruling, the WCJ thoroughly reviewed Ms. Moore's testimony and the medical records in evidence, stating as follows:

> [Ms. Moore] contends that not only did she injure her right shoulder, but she has injuries now to her left shoulder which she says stems from the right shoulder injury. She said she has cervical injuries she says stems from the accident, and she has lumbar complaints.
>
> There's no real testimony about what she actually performed over the course of time with respect to the activity that she did with her left shoulder. There's no evidence that she consistently . . . extended her left shoulder at or above shoulder level. I don't really know what she was doing in an excessive fashion with her left shoulder.
>
> . . . .
>
> . . . . There is no corroboration contained in the physical therapy records that Ms. Moore ever indicated to the therapist that she had injured her shoulder working with pulleys while undergoing physical therapy. There's no indication in Dr. Crenshaw's records around that same time frame that she ever reported to Dr. Crenshaw she had injured her left shoulder or exacerbated her left shoulder in any way working with pulleys while undergoing physical therapy.
>
> . . . .
>
> With regard to [Ms. Moore's testimony that], "Well, I've overworked my shoulder because I've injured . . . my right shoulder," . . . .
>
> . . . .
>
> . . . . When you look at the doctor's records, he never expresses any opinion in his records . . . that indicates there's any type of relationship between her left shoulder and her job injury.

13

Then this matter is further complicated by the fact that [the doctor] suggested -- he thought, for a time, she needed to have a workup for rheumatoid arthritis. And that was performed and she was positive for rheumatoid arthritis factor. This occurred in March of 2017 which is not very long after she began complaining about he left shoulder . . . . And she even noted to the physical therapist on March 28th of 2017 that . . . the therapist's record says, "The patient says that the doctor states she may have RA -- rheumatoid arthritis -- or lupus, and she will attempt to see a rheumatologist."

She testified she never attempted to see a rheumatologist. We don't -- I have no common knowledge about the interaction between rheumatoid arthritis, joint pain, stiffness in her neck, her shoulder, her fingers. . . . [L]ater he said [the EMG] was mildly positive for carpal tunnel on the right. . . . But he makes no statement anywhere about any relationship to these things to her right shoulder or her job accident or her fall.

With regard to a lumbar complaint that Ms. Moore raised at trial . . . . When you look at all of these medical records that began in April of 2016 all the way through March of 2019, nowhere in Dr. Crenshaw's records and nowhere in the physical therapy records is there any mention of any type of lumbar complaint made by Ms. Moore.

But in Dr. Crenshaw's records, you do see . . . some examinations that indicate Ms. Moore has a normal lumbar lordosis. For example, this was recorded January 29th of 2019.

. . . .

She is making complaints associated with her cervical spine. I noted in a thorough review of Dr. Crenshaw's records initially her cervical examinations were normal. . . . [T]here's some argument she had this C7 problem with her right finger. Well, this was taken care of by the EMG which found no radiculopathy problem associated with that, maybe mild carpal tunnel syndrome.

In every one of the physical therapy records -- it's pointed out that . . . she complains about her neck. . . . it has, "Generalized complaints of neck and shoulder girdle pain. Not well localized. Pain radiates no further than approximal two-third extremity."

. . . . [A]nd every time there's any mention about neck complaints, it's always the same thing: "Generalized neck complaint, not well localized. Radiates no further than approximal two-thirds extremity." This was followed by Dr. Crenshaw's continued findings of no cervical sensation problems in C3 through 7. That's consistent all the way through Dr. Crenshaw's records through March of 2019.

14

In this case, without any medical testimony or any medical record indicating any type of close relationship at all of a lumbar problem, a cervical problem, or a left shoulder problem associated with primary injury, Ms. Moore has failed to demonstrate by a preponderance of the evidence. . . . I think it's just speculation and conjecture because it's basically just her testimony alone being a lay person.

On appeal, Ms. Moore asserts that her testimony sufficiently established that the only logical explanation for the alleged injury to her left shoulder is that it was a natural consequence of the injury to her right shoulder, and there was no other intervening cause. However, we note, as did the WCJ, that there is no indication in Ms. Moore's medical records, or any medical testimony, that relates Ms. Moore's left shoulder injury to the work accident. In addition, there is no indication that Ms. Moore's left shoulder was more susceptible to injury as a result of her right shoulder being injured, and as, noted by the WCJ, Ms. Moore's testimony was insufficient to establish in what way she excessively used her right shoulder.

Further, there was some indication in Ms. Moore's medical records that the pain she was complaining of could have been related to rheumatoid arthritis, given her positive rheumatoid arthritis factor, and Dr. Crenshaw's suggestion she follow up with a rheumatologist; yet, Ms. Moore had not followed up with a rheumatologist as of the date of trial. Therefore, the WCJ's finding that Ms. Moore failed to establish that her alleged left shoulder injury was caused by the March 18, 2016 accident is supported by the record.

Similarly, the WCJ's findings that Ms. Moore failed to establish that her alleged injuries to her cervical spine and lumbar spine were caused by the March 18, 2016 accident are supported by the record. We note, as did the WCJ, that Ms. Moore's medical records do not mention any reports of back pain, but rather, only

show normal exams with respect to that region. In addition, Dr. Crenshaw's records show normal cervical spine examinations.

Therefore, we affirm the WCJ's denial of Ms. Moore's claims related to her left shoulder, cervical spine, and lumbar spine.

*Choice of Physician*

At trial, Ms. Moore testified that she seeks authorization to see Dr. Leglue for treatment of her alleged injuries to her neck and back. However, because we affirm the WCJ's denial of Ms. Moore's claims for benefits associated with cervical and lumbar regions, we further affirm the WCJ's denial of Ms. Moore's request for authorization to treat with Dr. Leglue for these injuries. Similarly, we affirm the WCJ's denial of Ms. Moore's request to treat with Dr. Fenn for issues related to her left shoulder, as she is not entitled to workers' compensation benefits related to her left shoulder.

On appeal, Ms. Moore also argues that the WCJ erred in denying her request to change orthopedists from Dr. Crenshaw to Dr. Fenn in connection with her right shoulder complaints. Louisiana Revised Statutes 23:1121 states in part as follows with respect to an injured employee's right to choose a physician:

> B.(1) The employee shall have the right to select one treating physician in any field or specialty. . . . The workers' compensation judge shall order the employer or payor to authorize the claimant's choice of physician unless the employer or payor can show good cause for his refusal. After his initial choice the employee shall obtain prior consent from the employer or his workers' compensation carrier for a change of treating physician within that same field or specialty. . . .
>
> (2)(a) If the employee is treated by any physician to whom he is not specifically directed by the employer or insurer, that physician shall be regarded as his choice of treating physician.

As recognized by *Reed v. St. Francis Medical Center*, 42,211, p. 7 (La.App. 2 Cir. 4/8/09), 8 So.3d 824, 828-29:

16

This statute gives an injured employee an absolute right to select one physician in any field without the approval of the employer. *Smith v. Southern Holding Inc.*, 2002-1071 (La. 1/28/03), 839 So.2d 5. However, the statute does not invest the claimant with the right to multiple treating physicians. *Cheatham v. Luberski Inc.*, 43,603 (La.App. 2 Cir. 9/17/08), 996 So.2d 373; *Thompson v. The Animal Hospital*, [39,154 (La.App. 2 Cir. 12/15/04), 889 So.2d 1193]; *Jasper v. Memorial Medical Center*, 2003-0489 (La.App. 4 Cir. 6/11/03), 853 So.2d 21. The claimant is not entitled to treatment by a new choice of orthopedic surgeon simply because the original one released her to return to work. *Cheatham v. Luberski*, *supra*; *Wiley v. Kenneth Parker Logging*, [97-1247 (La.App. 3 Cir. 3/6/98), 711 So.2d 297]. As with a claim for medical expenses under La. R.S. 23:1203, the claimant must show that a choice of a new treating physician is medically necessary. *Cheatham v. Luberski*, *supra*; *Thompson v. The Animal Hospital*, *supra*; *Captain v. Citgo Petr. Corp.*, 2006-481 (La.App. 3 Cir. 9/27/06), 940 So.2d 731; *Scott v. Piccadilly Cafeteria*, 1997-1584 (La.App. 3 Cir. 4/1/98), 708 So.2d 1296.

Allowing a claimant to change physicians merely because of his own displeasure with his initial choice of physician, without any evidence concerning the medical necessity of the requested change, would impermissibly "circumvent the requirement of medical necessity, negate Section 1121's 'one treating physician' rule, and authorize doctor shopping." *Id.* at 829.

In the instant case, Ms. Moore testified that she initially chose Dr. Garrison with Mid-State as her choice of orthopedist to treat her right shoulder, as indicated on a written choice of physician form she submitted to Kellie's. However, when she called Mid-State to make an appointment with Dr. Garrison, she was told he would not be available for some time, but that Dr. Crenshaw, who is also an orthopedist at Mid-State, could see her. Ms. Moore further testified that she was under the impression that she had to treat with Dr. Crenshaw because Dr. Garrison was not available; however, there is no evidence suggesting that Ms. Moore was required, or otherwise directed, by Kellie's, its workers' compensation insurer, and/or LIGA, to see Dr. Crenshaw.

17

Ms. Moore first started treating with Dr. Crenshaw in April 2016, and she consistently treated with him through March of 2019. He actively treated her with two surgical procedures, physical therapy, pain medication, and various diagnostic testing. He further ordered an FCE, which was performed in November 2018. Thereafter, in January 2019, Dr. Crenshaw gave Ms. Moore an injection in her right shoulder to help with her pain. She saw Dr. Crenshaw again March 29, 2019, and, according to the medical records from that date, Dr. Crenshaw determined she had reached maximum medical improvement, released her to return to sedentary employment, and told her to follow up on an as-needed basis.

Thereafter, in April 2019, Ms. Moore sent a letter to Mr. Johnson, her workers' compensation adjuster, stating she did not agree with Dr. Crenshaw's opinion regarding the status of her condition and requesting a second opinion. As of trial, March 29, 2019, was the last time Ms. Moore saw Dr. Crenshaw.

At trial, Ms. Moore testified as follows with respect to why she requested to change her treating orthopedist to Dr. Fenn: "Dr. Crenshaw does not show -- he's a -- he's a good man. He's a good man. But he doesn't show any interest in -- in what's going on with my condition on either one of my shoulders." She further testified at trial that Dr. Crenshaw was still an orthopedic surgeon practicing in Alexandria, Louisiana, he had not referred her to another orthopedist, and he had not discharged her from his care or otherwise refused to treat her in connection with her right shoulder problems. She further admitted that workers' compensation was continuing to authorize and pay for her treatment with Dr. Crenshaw.

The only evidence supporting Ms. Moore's request to change orthopedists is her own testimony regarding her displeasure after three years of treatment with Dr. Crenshaw, and only after he had determined she had reached maximum medical

18

improvement and released her to return to sedentary employment. However, there is no evidence contradicting Dr. Crenshaw's assessment or course of treatment, much less any evidence establishing the medical necessity of changing orthopedists. Therefore, we find no error in WCJ's denial of Ms. Moore's claim seeking authorization to treat with Dr. Fenn.

## **DECREE**

For the reasons set forth above, the ruling of the WCJ is affirmed. Costs of this appeal are assessed to Appellant, Alma Moore.

**AFFIRMED.**